```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4
   ASHLEY HARVEY, INDIVIDUALLY  )(
 5 AND AS NEXT FRIEND OF L.H.,   )(
   A MINOR,                      )(   CIVIL ACTION NO.
 6      PLAINTIFFS,              )(   2:18-CV-164-JRG
   VS.                           )(   MARSHALL, TEXAS
 7                               )(
   CARTHAGE INDEPENDENT SCHOOL   )(
 8 DISTRICT, OTIS AMY, SCOTT     )(
   SURRATT, AND DR. JOSEPH       )(
 9 GLENN HAMBRICK,               )(   DECEMBER 21, 2018
        DEFENDANTS.              )(   9:06 A.M.
10

11                      MOTION HEARING

12      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                  UNITED STATES DISTRICT JUDGE

14 APPEARANCES:

15

16 FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                       in minutes of this hearing.)
17

18 FOR THE DEFENDANT: (See Attorney Attendance Sheet docketed
                       in minutes of this hearing.)
19

20 COURT REPORTER:    Shelly Holmes, CSR, TCRR
                      Official Court Reporter
21                    United States District Court
                      Eastern District of Texas
22                    Marshall Division
                      100 E. Houston
23                    Marshall, Texas  75670
                      (903) 923-7464
24

25 (Proceedings recorded by mechanical stenography, transcript
   produced on a CAT system.)
```

1                           I N D E X

2

3  December 21, 2018

4                                                Page

5        Appearances                            1

6        Hearing                                3

7        Court Reporter's Certificate           36

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for hearing on

 4   the Defendants' motion for sanctions in the Harvey versus

 5   Carthage ISD matter.  This is Civil Action 2:18-CV-164.

 6   Let me call for announcements at this time.

 7              What says the Plaintiff?

 8              MR. DUNNAM:  The Plaintiff is ready, Judge.  Jim

 9   Dunnam, Chad Dunn, Eleeza Johnson, and Andrea Mehta.

10              THE COURT:  All right.  What says the Defendant?

11              MR. EICHELBAUM:  Defendants are ready, Your Honor.

12   Dennis Eichelbaum, Andrea Mooney, and Scott Thomas for the

13   Defendants.

14              THE COURT:  All right.  Let me hear argument on

15   the motion.

16              Mr. Eichelbaum, this is your motion on behalf of

17   the Defendants.  I'll hear from you from the podium.

18              MR. EICHELBAUM:  Thank you, Your Honor.

19              We're here over an expert testimony.

20              THE COURT:  You can -- you can dispense with the

21   background.  I've read the briefing.

22              MR. EICHELBAUM:  All right.  Your Honor --

23              THE COURT:  I know why we're here.

24              MR. EICHELBAUM:  Thank you, Your Honor.

25              THE COURT:  I think you all know why you're here.
```

1    That's why you're here on the Friday before Christmas.

2         MR. EICHELBAUM:  Yes, Your Honor.

3         THE COURT:  Go ahead with your argument.

4         MR. EICHELBAUM:  Thank you.

5         The expert report which was sent to Mr. Dunn was

6    not something that we had access to.  We didn't have a copy

7    of it.  In comparing the two, it is very clear that the

8    original declaration was not what the expert actually said,

9    and if I may, I'm going to place --

10        THE COURT:  You may.

11        MR. EICHELBAUM:  If you'll give counsel copies.

12   Thank you.

13        Your Honor, this is a comparison of the actual

14   report that was turned in and just excerpts with the

15   highlights of the most egregious.

16        The expert report went from three pages to nine

17   pages.  And going through the changes, you can see that

18   whereas there are significant -- and, Your Honor, would you

19   like an actual paper copy?

20        THE COURT:  I can -- I can see it on the screen.

21        MR. EICHELBAUM:  All right.  Thank you, Your

22   Honor.

23        Going through this, you can see that there are

24   tremendous changes that took place, an evolution, if you

25   would, from a very short report where the expert claimed

1  that there was negligence in failing to protect from harm

2  one of their students, to the school administrators have a

3  responsibility to provide a safe educational environment to

4  all students.

5         None of this language is found in the expert

6  report, talking about their responsibilities, claiming that

7  the -- the superintendent, principal, and head coach failed

8  to take a reasonable action similarly situated

9  administrators would have reasonably --

10        THE COURT:  Slow down, counsel.  Slow down.

11        MR. EICHELBAUM:  I'm sorry.

12        These are all things that are not found in the

13  expert report on the right side.  These actions include a

14  thorough investigation, which would include at a minimum

15  interviews of appropriate students and a review of

16  electronic data, includes cell phone -- cell phones alleged

17  to have captured or distributed the images.

18        And what has happened is the expert's report was

19  significantly changed and fundamentally changed by the

20  attorney.  He went on to say:  As the evidence I have seen

21  suggests -- which by the way, he testified he hadn't

22  seen -- then the administrators had a duty and

23  responsibility to take investigative and undertake

24  corrective and disciplinary action.  Simply referring to

25  the matter to law enforcement, as Defendants suggests, was

1  acceptable in their disclosures and pleadings -- documents

2  he didn't look at -- is not compliant with an

3  administrator's duties and is not what a reasonable Texas

4  administrator would have done under the same or similar

5  circumstances.

6          He goes on -- and I'm not going to go through each

7  of these, but on Page 2 of this same document, he starts

8  getting into that there's evidence that the school district

9  administrators took action in at least one other allegation

10 of lewd student photographs.

11         Nothing in his expert report ever talks about

12 that.  That was all added by the attorney.  He says, such

13 example, if the jury determines it occurred, demonstrates

14 that the administrators understood their proper

15 responsibilities, et cetera.  None of that came from the

16 expert.  It all came from Mr. Dunn or his office.

17         You go on, and it says, if the jury determines

18 that GC had previously taken nude photos, again, none of

19 that came from the expert.  This all came from the

20 attorney.  It went from a three-page document to a

21 nine-page document.  Then talking about law enforcement on

22 the next page.

23         Then what you see is that he started to

24 significantly alter the actual testimony.  And what I've

25 done is I've highlighted where he adds here:  It went from

1  it is once again negligence -- which by the way, if it's

2  negligence, there's no liability for the school district.

3  But what the attorney does is he changes it from negligence

4  to a deviation from an administrator's duty.  Then he says,

5  thus creating a greater likelihood that similar conduct

6  could go unpunished in the future.  Then he adds language

7  like, that the discriminatory policies exist in practice,

8  something the expert never said, talking about and

9  exacerbated the situation and harm.  Again, things the

10  expert never said.

11        And then, finally, if we go to the last page where

12  he changes it from gross negligence to thereby violating

13  their duties and public administrators of a public school

14  district and high school in Texas.  And then talking about

15  the football championship and things, which are factually

16  not correct, as well as because he was a JV quarterback.

17  He wasn't on the varsity when they won the state

18  championship, the year that -- that all this happened.

19        Now, according to the Defendants, they're allowed

20  to -- and I agree, an attorney's duty is to look over an

21  expert's report and to make sure it's in proper format, but

22  the cases that they cited are not cases that say that they

23  can rewrite the report.

24        They cite the Zoch case, which the lawyer

25  translated from German so that the jury could understand

1  it.  Well, that's -- that's fair.  He didn't significantly

2  change it; he translated it.

3          There's another case where he cites, the Tech

4  Pharmacy case, where he -- the attorney had to write in a

5  format that would make sense because it was written by an

6  auto mechanic.  He wasn't very educated.

7          We have Dr. Huff who has a doctoral -- he's an

8  educator.  He knows how to write his own reports.  He

9  doesn't need an attorney to rewrite it.

10          And then, finally, the Sietz case, which talks

11  about there are numerous communications going back and

12  forth between the person who is writing the expert report

13  and the attorney, making suggestions, making changes,

14  modifying the content.  That's not what happened here.

15          According to the expert, he wrote his report, he

16  spoke to the Plaintiff mother, he's not sure if he talked

17  to the daughter, and then he sent the report to Mr. Dunn.

18  Mr. Dunn then retyped it, which he had to because he

19  couldn't send it in Word format, he sent it -- he took

20  photos of it, apparently, and sent it to him.  So he had

21  retype it.  That's fair.

22          But it went from three to nine pages and added all

23  this content.  And what he testified to was he simply

24  signed it.  And he even admits in his emails afterwards,

25  which Mr. Dunn puts in, that I shouldn't have signed it.

1          Now, what happened here is --

2          THE COURT:  Let me ask you this, counsel.

3          MR. EICHELBAUM:  Yes, Your Honor.

4          THE COURT:  How do you come up with 400 questions

5     about a nine-page report?  I regularly have cases in this

6     court with two and 300-page expert reports, and they don't

7     get 400 questions on a deposition.

8          MR. EICHELBAUM:  Well, I didn't get to use 400

9     questions.  But --

10          THE COURT:  My question is --

11          MR. EICHELBAUM:  Yes.

12          THE COURT:  -- how do you prepare 400 questions

13     about a nine-page report?

14          MR. EICHELBAUM:  Because it wasn't simply about a

15     nine-page report, it was also going to be about

16     Mr. Harvey's affidavit, which came in at the end.  It was

17     also going to be about what L.H. testified to, it was also

18     about what A.H. testified to in their depositions.  It was

19     also going to be about what Mr. Surratt and the other two

20     testified to in their depositions, and then the whole -- I

21     had to go into his book, his expertise --

22          THE COURT:  How many hours did it take you to read

23     his book?  It's 178 pages long.

24          MR. EICHELBAUM:  It was two hours, I believe.

25          THE COURT:  Okay.

1          MR. EICHELBAUM:  And it's highlighted and

2   annotated.

3          I'm sorry, I don't think I brought the book with

4   me.  But I brought my questions with me if you would like

5   me to bring them forward.

6          It took a lot of time because --

7          THE COURT:  If I want something, I'll ask for it.

8          MR. EICHELBAUM:  I'm sorry, Your Honor.

9          THE COURT:  Go ahead.

10          MR. EICHELBAUM:  This expert is the key to their

11   case because all they have is L.H. and A.H. saying, this is

12   what we think happened, but we didn't actually talk to

13   anyone.

14          They had Dr. Harkrider at one point who was

15   supposed to be an expert.  Dr. Harkrider happens to be the

16   uncle of L.H., who Plaintiff is claiming I intimidated out

17   of being an expert because I asked for his deposition.

18   Somehow it keeps -- gets deflected as it's always my fault

19   whatever happens in their case.

20          So what happened was I asked for Dr. Harkrider

21   first because these two experts are going to talk about

22   what a reasonable school administrator should have done

23   because that's the whole issue here is deliberate

24   indifference and what a reasonable educator would do.

25   That's what they have to prove under Title IX.  That's the

1  only issue remaining.

2       So I had to prepare questions that were going to

3  go into what do you do to investigate a Title IX matter, an

4  allegation?  What kind of investigation do you do with

5  technology and cell phones?  What experience do you have in

6  doing these things?  What's the difference between a

7  principal and a superintendent because he's testifying

8  against the superintendent also.  He's testifying against

9  the coach.  What experience do you have in what a coach

10  does?  I have to go through all of those things to be able

11  to show that he's not an expert in these areas.

12       THE COURT:  Well, let me ask you this.  You said

13  that Dr. Huff was the key to the Plaintiffs' case.  At the

14  end of the deposition, Mr. Dunn withdrew Dr. Huff --

15       MR. EICHELBAUM:  Yes.

16       THE COURT:  -- and indicated he was not going to

17  use him as an expert witness or any kind of witness in the

18  case.

19       So if he's the key to the case and the Plaintiffs

20  have withdrawn him, haven't they self-sanctioned to some

21  degree by taking him out of the case as opposed to merely

22  continuing the deposition and seeking to repatriate or

23  prepare better or otherwise put him in a different position

24  and then try to go forward with him as an expert in the

25  case at a later date?

1          MR. EICHELBAUM:  That's yet to be seen.  We don't

2     know yet because we don't know who else they're going to

3     try to bring in in the future.  We don't know what other

4     things they're going to do.  It absolutely does hurt their

5     case that currently they don't have an expert who can

6     testify to that.

7          But, Your Honor, the question here today is we

8     shouldn't have had to even go down there for this

9     deposition.  Had they prepped their witness and talked to

10    him before the deposition, they would have probably found

11    out that he hadn't read all of those documents, that he

12    didn't read his declaration before he signed it, and they

13    would have pulled him so that the school district -- even

14    if I had prepped, put my questions together, I wouldn't

15    have had to fly down there, go through 39 minutes of

16    deposition.  It was that bad that they pulled it after 39

17    minutes.  I never had that.  And they -- and say, well,

18    okay, king's X, too bad.

19         The school district shouldn't have to pay for

20    that.  Had they prepped their witness, had they not rewrote

21    and tried to pass off a fake declaration, then none of this

22    would have been necessary.

23         THE COURT:  Mr. Eichelbaum, I have your

24    submissions for your airline expense --

25         MR. EICHELBAUM:  Yes, Your Honor.

1          THE COURT:  -- and I believe a rental car.  What

2    are you asking the Court to do here?

3          MR. EICHELBAUM:  We're asking for the attorney's

4    fees and cost associated simply with this deposition.  We

5    have brought our -- our fee statement, but the total amount

6    is $9,441.50 in fees, my costs, which were $578.52, and the

7    cost of the transcript, which was $613.90.

8          THE COURT:  All right.  What else do you have for

9    me?

10         MR. EICHELBAUM:  Do you want me to address the

11   other issues involved in his response, such as the letter

12   that I sent Saturday to him talking --

13         THE COURT:  I've read the letter.

14         MR. EICHELBAUM:  Okay.

15         THE COURT:  I mean, this is your motion.

16         MR. EICHELBAUM:  All right.

17         THE COURT:  I don't have all day, and it is a busy

18   time of the year, but on the one hand, I'm not going to

19   tell you what to present in your motion, but on the other

20   hand, I'm going to give you some latitude to make sure that

21   you've covered what you think is adequate.

22         MR. EICHELBAUM:  Thank you, Your Honor.

23         Just a few more points then.

24         The Saturday letter was written based upon the

25   Homeland Security report, which exonerates our clients.

1  We're not going to be objecting to the Homeland Security

2  document going into court.  In fact, we're going to put it

3  in also, if necessary, because it completely exonerates our

4  clients.  I believe once you have that in front of you,

5  you'll see that.

6        What we did was we tried to offer the Plaintiffs a

7  life line to say, look, you didn't know it before, so now

8  that you know it, you were relying on this to be your

9  smoking gun.  It's not your smoking gun.  Let's settle this

10  case.  And we offered, as you saw in the letter, even less

11  than what we're asking for today to just go away and

12  separate and end the case.

13        It had nothing to do with this motion and this

14  motion being a preemptive strike or anything like that, as

15  he tries to deflect the purpose of this motion.

16        With regard to the certificate of conference, the

17  reason we had to file it that day was because this Court's

18  order said that it was the last day that we could file any

19  motion that would require a hearing.  And so we had to

20  scramble.  We didn't even have the transcript, and we

21  supplemented, as you know.

22        But we did send a certificate of conference once

23  we had the pleading prepared.  The deposition took place on

24  Tuesday.  On Wednesday, I was in Wichita Falls leading a

25  training, and then that evening, I had a school board

1  meeting.  So I didn't get to start looking at it until the

2  following day.

3        It all got done that day.  We did the certificate

4  of conference attempt, and, by the way, he was in -- he

5  says he was in California, which means it was two hours

6  earlier.  He could have looked at it and responded.  I

7  apologize, I don't know his -- his schedule when he teaches

8  his class.  I don't know if it's every Thursday.

9        Apparently, according to the -- the website, it's

10  every other Thursday.  I'm not sure which Thursday those

11  are.  So it doesn't say on the website that he was teaching

12  that day in particular.  I don't -- I'm not claiming he's

13  not telling the truth on that.  I'm simply saying there was

14  no motive of, oh, I bet he's in California, and he's

15  teaching a class.  He can't respond to the certificate of

16  conference.  I did it as soon as I could.  But we still had

17  to file it that day, so we filed the motion.

18        And with regard to the claim that -- oh, we sent

19  it to -- a copy to everyone.  The reason I sent it to him

20  and not to the other attorneys is because he was the only

21  one that appeared at the deposition.  He was the only one

22  who knew what his client said, and he was the one who was

23  basically being sanctioned.  And so I sent it to him for

24  consideration and not the other attorneys because they

25  didn't even order a copy of the transcript at the time.  So

 1   they wouldn't know what I was talking about.

 2          THE COURT:  Let's talk about your certificate of

 3   conference.

 4          MR. EICHELBAUM:  Yes, Your Honor.

 5          THE COURT:  From what I can see, you sent to

 6   Mr. Dunn an email at 4:43 p.m., and at 6:03, you filed the

 7   motion saying you hadn't been able to have any kind of

 8   communication to adequately discharge your obligation under

 9   the certificate of conference requirement.

10          MR. EICHELBAUM:  Yes, Your Honor.

11          THE COURT:  Did you do anything else other than

12   send the one email at 4:43 p.m. before you filed the motion

13   for sanctions at 6:03?

14          MR. EICHELBAUM:  No, Your Honor, I didn't.

15          THE COURT:  Do you think that's a -- do you think

16   that's sufficient to meet the Court's requirements?

17          MR. EICHELBAUM:  At the time, it was all that I

18   had, Your Honor, and had I called him, he would have still

19   been in California.  So it wouldn't -- apparently, it

20   wouldn't have mattered.

21          To me, we have communicated throughout via email.

22   Some of the time, it's been rather quick.  I usually

23   respond quicker than he does, but he may be very busy.  I

24   understand that.  There was no intent, though.

25          And, by the way, Your Honor, I -- so far in my

1 career, and granted it's only 30 something years, but I've

2 never had someone agree to a motion for sanctions.  I mean,

3 if this were a motion for --

4        THE COURT:  Oh, so we don't need a certificate of

5 conference?

6        MR. EICHELBAUM:  No.

7        THE COURT:  You can just say you know what they're

8 going to say, so I'll just not do that?  Is that what

9 you're telling me?

10        MR. EICHELBAUM:  Absolutely not, Your Honor.

11        THE COURT:  That sounds like what you're telling

12 me.

13        MR. EICHELBAUM:  Well, that was not the intent,

14 Your Honor.  What I'm saying is that's what I had at the

15 time.

16        THE COURT:  You didn't -- you didn't call.

17        MR. EICHELBAUM:  I didn't.

18        THE COURT:  You didn't try to call.  You didn't

19 leave a voicemail.  You sent an email, and less than two

20 hours later, you filed the motion saying that you had

21 complied with the requirement to conference with opposing

22 counsel or had done what you thought you could do?

23        MR. EICHELBAUM:  I do not recall making a phone

24 call.  So the answer to that is yes.

25        THE COURT:  All right.  Let's get back to the

1   substance of your motion.  What else do you have that you

2   haven't presented yet?

3          MR. EICHELBAUM:  That's all, Your Honor.

4          THE COURT:  All right.  Let me hear a response

5   from Mr. Dunn.

6          MR. DUNN:  Your Honor, I'm Chad Dunn.  Mr. Dunnam

7   was going to speak for us, but I can address it if you'd

8   prefer.

9          THE COURT:  Well, you were the person on the

10  scene, but I'll hear -- I'll hear from the Plaintiff,

11  however y'all want to present it.

12         MR. DUNNAM:  The reason being, Judge, is I believe

13  that Mr. Dunn, to the extent that the Court wants to hear

14  something under oath or as an officer of the court as

15  testimony, we thought it would be appropriate for me to

16  make the argument and then for him to make any factual

17  representations or answer any questions of the Court, that

18  is the reason we thought that was the proper way to do it.

19         THE COURT:  Well --

20         MR. DUNNAM:  We'll do it any way --

21         THE COURT:  -- if you're prepared to present it in

22  that way, that's fine.  If Mr. Dunn had presented the

23  argument, I would not have hesitated to ask him to make

24  representations to me from the podium as an officer of the

25  Court, and I would have taken them as such.  But however --

1  however you two want to go forward.

2          MR. DUNNAM:  We -- we're prepared either way,

3  Judge.  We just felt like we would -- you may want us to do

4  it in that manner, because he would be in a sense

5  testifying, Judge.

6          THE COURT:  Well, you all decide and let me hear a

7  response.

8          MR. DUNN:  May it please the Court.  Chad Dunn on

9  behalf of the Plaintiffs and himself.

10          Your Honor, I think it's clear from the affidavits

11  or declarations and other evidence that we presented that I

12  have handled more expert reports than I can recall.  I've

13  never had a circumstance where an expert witness showed up

14  at the deposition and testified that they didn't receive

15  some documents.

16          When Dr. Huff did so, I had my laptop available to

17  me.  I immediately pulled up the email history that we

18  submitted to the Court.  I recalled having asked

19  Ms. Johnson to provide him the documents.  I checked the

20  Dropbox that was there.  I ensured that the documents that

21  the witness testified he hadn't seen were in the Dropbox.

22  The other documents that -- that the witness denied having

23  seen were also listed in the Dropbox.  They had not been

24  provided to him any other way.

25          THE COURT:  Let me ask you this, Mr. Dunn.  I've

1    read your lengthy response in your declaration.  Did you

2    ever meet with Dr. Huff face-to-face before this deposition

3    started?

4         MR. DUNN:  I didn't meet with him face-to-face,

5    no, sir.

6         THE COURT:  Are you used to putting on expert

7    witnesses who have never been an expert witness in a case

8    in court before without meeting with them in person and --

9    and assuring yourself that they're prepared and ready to go

10   forward in the deposition?

11        MR. DUNN:  I'm not sure I've ever presented an

12   expert witness who had never been --

13        THE COURT:  Who -- who was going to prepare this

14   witness for the deposition, or was it all going to be done

15   remotely?

16        MR. DUNN:  It was done remotely.  That was my

17   decision, which I own the responsibility for.  I talked to

18   him extensively the night before.  And he was driving in

19   from Houston, and I would -- I think for more than half of

20   his drive, I talked to him on the phone about his

21   deposition.

22        But I don't have an excuse, Your Honor.  I didn't

23   meet with him in person.  He was in Houston.  I recently

24   moved to Austin.  And, you know, all I can do is say lesson

25   learned here.  I'll never put an expert in a deposition

1  again without meeting with him in advance of it.

2          THE COURT:  Had you ever done that before?

3          MR. DUNN:  No, sir.  Oh, have I ever presented an

4  expert without meeting with him?  Yes, sir, many times.  A

5  lot of experts I use are in other parts of the country.  I

6  will meet with them in advance of the deposition, which I

7  did with Dr. Huff.  So I -- I didn't -- I didn't meet with

8  Dr. Huff in advance of the day of his deposition, but prior

9  to going into the deposition, we met out in the parking lot

10  and discussed -- followed up on a few things that we'd

11  talked about in our conferences that -- that morning by

12  phone and then the day before.

13          But, yes, I presented a number of experts for

14  depositions that I've not been with in person because

15  they've been in other parts of the country.

16          THE COURT:  Well, whether you met with him in

17  person or whether you talked to him over the telephone, how

18  is it that the problem with the documents delivered by

19  Dropbox and whether he'd seen them and read them and

20  considered them before he was deposed, how is it that

21  didn't come up until the deposition?  How is it you didn't

22  learn until the deposition was underway that he hadn't read

23  what you thought you'd sent him?

24          MR. DUNN:  I can't explain that.  We had

25  discussed --

1          THE COURT:  In -- in the conversations you had

2   with him, you never asked him, did you get the material we

3   sent you by Dropbox?  Have you read it?  Do you have any

4   questions about it?  Is there anything you want to discuss

5   with me about that material?  Apparently, that part of the

6   conversation never took place.

7          MR. DUNN:  That part of the conversation did not

8   take place.  But we did discuss some of the documents that

9   were in the Dropbox.  And so from that --

10          THE COURT:  So you assumed he'd seen all the

11  documents in the Dropbox?

12          MR. DUNN:  Well, he had signed a declaration to

13  that effect, and so I was basing my conclusion that he had

14  seen the documents on the declaration, and I was also

15  basing it on the fact that he had seen at least some of

16  them because we discussed those.

17          THE COURT:  What was your thinking after the break

18  in the deposition that led you to withdraw him as a witness

19  in the case as opposed to merely asking for more time to do

20  more thorough preparation and then go forward with the

21  deposition at a later time?

22          MR. DUNN:  Well, I had several thoughts.

23          The first was I had seen the email traffic showing

24  the Dropbox and had, as I mentioned, while the testimony

25  was still undertaking, I looked up those things, and I knew

1  that he had, in fact, seen these documents.

2      And my concern was over how he answered that

3  question, he wasn't going to have testimony that would

4  ultimately be persuasive to a jury later on the other

5  issues.

6      The second reason that I withdrew him is in that

7  split sort of decision process, I had -- I had made the

8  decision that I didn't believe I could proffer an expert

9  who had testified inconsistently from his declaration to

10  what he said in deposition.  And so for better or worse, I

11  made the judgment that it was my responsibility to not

12  present him as a witness in this case.

13      I should add --

14      THE COURT:  As --

15      MR. DUNN: I'm sorry.

16      THE COURT:  As you stand here now, is it your

17  intention to replace him, if possible, or is it your

18  intention to go forward without him or someone of a similar

19  posture as an expert witness in the case?

20      MR. DUNN:  That was the piece I was about to add.

21      Also, we had questioned whether we were going to

22  get an expert on this subject at all and were on the fence

23  about it and didn't view it as necessary in light of Chief

24  Hardy's testimony.

25      And Hardy himself has been a school administrator

1  in a different -- in addition to being a law enforcement

2  officer.  And Chief Hardy was to provide the testimony that

3  Dr. Huff was to provide.  So I viewed my responsibilities

4  regardless of their impact on the case, but I also didn't

5  view Dr. Huff as a necessary witness.

6       So in answer to the Court's question, we do not

7  intend to offer a replacement for him.  What testimony that

8  we would have received from Dr. Huff we intend to elicit

9  from Chief Hardy, and a bunch of that is described in the

10 declaration we obtained for the summary judgment response.

11      THE COURT:  Well, we're fast running out of time

12 to do anything else in this case with the trial date set in

13 early February.

14      The -- the tone of the motion seems to communicate

15 that Dr. Huff was merely a strawman for a report that you

16 wrote, and when the deposition took place, it became

17 apparent that he was made of straw and didn't know anything

18 about it.

19      From a high level, tell me -- tell me your

20 position on that, and there's -- there's a line somewhere

21 that we all know about between reviewing the expert's

22 report, making sure that it's what it should be, and

23 writing it for them and substituting your views for the

24 expert's views and having truly a strawman expert.

25      Tell me -- tell me your response to the

1  allegations -- or if not direct allegations -- well, I

2  think we -- we've heard direct allegations of that this

3  morning.  Tell me your response.

4      MR. DUNN:  I -- Dr. Huff remains steadfastly of

5  the opinion that the behavior of Carthage ISD in this case

6  deviated from what reasonable school administrators would

7  do under the same or similar circumstances.

8          I learned of Dr. Huff by a very well-respected,

9  long-time superintendent in the Houston area.

10          When I first contacted Dr. Huff, I explained to

11  him that we didn't want him to testify to facts.  We just

12  wanted to know if facts were true, what would be his

13  opinions.  I recommended to him to talk to my clients.

14  Ms. Johnson arranged that conversation, which occurred.

15  And when he called me afterwards, Dr. Huff was livid about

16  it and was outraged about the conduct here.

17          And I viewed my edits to his report as actually

18  toning them down.  And I also was uncomfortable with

19  Dr. Huff making representations about what had actually

20  occurred, and I thought it -- for trial strategy reasons

21  and several others, I thought it -- it was for the benefit

22  to let the jury determine what actually occurred and let

23  Dr. Huff talk about what should happen assuming these

24  events occurred.

25          But even after I withdrew them, he was angry about

1   Carthage's behavior, was disappointed he was not going to

2   be testifying about it, and in his email that he sent to me

3   afterwards asked to apologize to the family.

4        So the idea that I have somehow planted Dr. Huff's

5   views is absolutely false.

6        THE COURT:  So as I understand it, what you're

7   telling me is you would have supplied the factual basis,

8   hypothetical or otherwise, for him to render an opinion,

9   but what you were looking for for him was to simply to

10  opine about a set of facts that you would profer?

11       MR. DUNN:  Exactly.

12       THE COURT:  And you supplied that in the report,

13  or you supplied that portion of the report from which he

14  would then base his opinions?

15       MR. DUNN:  Well, I believe the clients provided

16  the -- the facts to them.  I mean, so the way I looked at

17  it is our clients will testify to these events, and I

18  wanted Dr. Huff to have heard what -- what that likely

19  testimony would be, but --

20       THE COURT:  Let's -- let's -- let me ask it

21  another way.

22       The original genesis of this report from Dr. Huff,

23  did he send you something in writing that you revised and

24  sent back to him, or did you prepare a draft to begin with

25  and send it to him for comments?  Who -- who put the

1  initial words on paper here?

2      MR. DUNN:  Dr. Huff.  The report -- the -- you

3  know, I call it a draft report.  I, as a matter of

4  practice, ask the expert to prepare a first draft of the

5  report.  Dr. Huff had had no experience preparing a report

6  before.  So I provided him two others used in other federal

7  court cases.  I sent him a copy of Rule 26, and I asked him

8  after he reviewed the records I sent him and talked to my

9  clients to take a shot at drafting the report.

10      He was reluctant to do so.  He was nervous about

11  it, and, in fact, he expressed to me that he had not

12  written reports before and didn't know where to start, and

13  that's why I suggested to him, I'll give you some

14  background, but I want you to lay out what your opinions

15  are first.  You're the person who understands these things.

16  And then we'll work together as a team to work on your

17  report, which is what, in fact, occurred.

18      He sent his draft report.  We discussed it.  He

19  said I feel like it probably needs more attention.  I've

20  never written something like this before.  And so the -- me

21  and the other lawyers involved in the case made edits to

22  it, sent it to him.  We had one or two discussions during

23  that time frame.  And then once he got the report, my best

24  recollection is we had two more conversations before he

25  actually signed it.

1           And then as I believe I mentioned in my affidavit

2    or declaration, I -- when he contacted me and asked to

3    return just the signature page, I said that I didn't think

4    that was -- I didn't think we should do that.  He should

5    submit to me all seven pages.  He did so.  They were hard

6    to read.

7           My assistant then spent several hours working with

8    him this afternoon -- or that afternoon.  At no point in

9    time did he suggest that there was a problem with the

10   report.  Everybody knew that he had been shared these

11   documents.

12          You know, in retrospect -- and I've seen this done

13   in expert reports, I'm not sure if I've ever actually done

14   it.  But in retrospect, I think we could have provided him

15   no documents and not had him talk to the Plaintiffs, and

16   instead say, assume these facts are true, what are the

17   responsibilities of the school administrators?

18          And, you know, perhaps that's what I should have

19   done.  This is an imperfect science, practicing law.  I do

20   the best that I can.  I believe that Dr. Huff strongly

21   holds these opinions, and I did nothing to persuade him

22   otherwise.

23          THE COURT:  What have you heard in the argument

24   that the Court's received from Mr. Eichelbaum today that

25   you want to either deny or draw a distinction about that I

1  should hear as a part of the argument?

2       MR. DUNN:  Well, I think, just speaking freely,

3  Your Honor, his motion is completely out of order, and the

4  letter that he sent the Saturday morning thereafter is -- I

5  hesitate to state an opinion on it, but it ought to be the

6  most shocking thing that has been filed in this case to

7  date.

8       I have not developed a final opinion as to where

9  it sits under Rule 4.04 of the rules of disciplinary

10  conduct or particular penal code provisions, but it struck

11  me at the time as an effort to extract out of me money and

12  sacrifice the rights of my clients.

13       I expressed so.  I haven't developed final

14  opinions on the letter, but I have never in my practice

15  seen a lawyer write a letter such as that.  And I believe

16  the tone of the motion was completely out of order, and

17  that -- that a lack of effort on behalf of Mr. Eichelbaum

18  to get to the bottom of what had actually occurred is

19  itself a lack of foundation for the motion.

20       And I'll be candid, I think at this point, after

21  the last seven days and all the efforts that I've gone

22  through to respond to these allegations, that no sanctions

23  whatsoever are necessary.

24       But I will say this, of course I'm -- it's in the

25  cheap seats now looking in the background, but had he

1  called me the next day, I would have offered to pay some of

2  the travel and court reporter expenses, although I don't

3  view it my responsibility to be the warrantor for a witness

4  testifying to what they've already said under oath in a

5  written document.  But I would have nevertheless done so.

6           Instead, I had this motion filed on me with

7  aspersions, little to no legal authority cited, and the

8  central premise of it is that the lawyer somehow did

9  something wrong by having participated in helping an

10  expert, especially a new expert, draft the report.

11           So I deny each and every one of these allegations.

12           THE COURT:  All right.  Do you have anything else

13  for me?

14           MR. DUNN:  No, sir.

15           THE COURT:  All right.  Thank you.

16           Mr. Eichelbaum, do you have any brief follow-up

17  for me?

18           MR. EICHELBAUM:  Very brief, Your Honor.

19           If you look at the email that counsel produced

20  from his expert, the expert talks about the fact that when

21  I received your formal statement that was prepared --

22  prepared for me, that's why I questioned the number of

23  documents it listed that I reviewed.

24           So, clearly, he knew that and was asked about it

25  back then, but today he professes he had no idea.  He

1   didn't explain how the -- the significant alterations to

2   the report, he didn't explain how the report went from

3   three pages to nine pages with substantive content filled

4   that never comes from Dr. Huff.

5          We hear today that he was livid.  When he was in

6   front of me, he wasn't upset.  When he was being deposed,

7   he didn't sound like he was upset with the school district

8   or anything.  We have to assume everything that Mr. Dunn is

9   saying is true.

10          But I don't know why that is.  He spoke for the

11   expert both in his written report, as well as today.  But

12   he doesn't have anything from the expert saying this is

13   what happened.  This was my mistake.  He didn't bring in an

14   affidavit to that effect.  He didn't say that these were my

15   true opinions.  He didn't do any of that from the expert.

16          You just have to accept that Mr. Dunn says it's

17   true, so it must be true.

18          THE COURT:  Let me ask you this, Mr. Dunn has told

19   me that he doesn't intend to seek an additional expert to

20   replace Dr. Huff in the case, but he intends to rely,

21   apparently, to some significant degree on Officer Hardy.

22          Has Officer Hardy been deposed in the case?

23          MR. EICHELBAUM:  No.

24          THE COURT:  What's the status of the discovery

25   with regard to Officer Hardy?

1          MR. EICHELBAUM:  Officer Hardy was a nominal

2 witness up until the depositions of the Plaintiffs' --

3 well --

4          THE COURT:  Yeah, don't characterize him for me.

5 I didn't ask you to do that.  I just asked has his

6 deposition been taken?  Is it being planned?  It is clear

7 now, whether he was in a different posture or not, that

8 he's going to be a significant part of the Plaintiffs'

9 case, and I want to know what's the status of him being

10 deposed?

11          MR. EICHELBAUM:  We're past the discovery

12 deadline, so I have not spoken to Mr. Dunn as to whether or

13 not he will agree to allow me to depose him.

14          All of this came about when he filed that

15 declaration.  So it has been a matter of, what, two weeks,

16 and it came -- as I said, right after their depositions, he

17 was a nonentity as far as we were concerned up until then.

18 And so if we're able to depose him, we would still want to

19 depose him, but I'm not sure we can get him in time to use

20 him for the summary judgment reply.

21          THE COURT:  All right.  All right.  What else do

22 you for me?

23          MR. EICHELBAUM:  Nothing further, Your Honor.

24          THE COURT:  Okay.  Counsel, before I forget it, I

25 need to tell you this, I've entered an order this morning

1  with regard to the educational records that the Court's

2  reviewed in camera.

3        I don't know if that's been delivered to you

4  through the electronic mailing matrix yet.  If it hasn't,

5  it's on its way to you.  The order I've entered this

6  morning direct that those records be retrieved from the

7  Court.  I mentioned this so that they can be retrieved

8  before you leave here today and save somebody a trip to

9  come back to Marshall and get them later.

10       I have a hard copy of the order if you want to

11 review it afterward we finish the hearing today just so

12 there'll be no questions as to who is to do what.  And I'll

13 give a hard copy of the order to the courtroom deputy to

14 make it available for you to review, again, to confirm what

15 your responsibilities are with the retrieval of these

16 records and to see that you avoid having to make a

17 duplicative trip to get them later.

18       I have some real concerns about this case, not

19 from a substantive standpoint, but from a professionalism

20 standpoint.

21       I mean, I don't know that I've ever seen a

22 complaint make as many unsubstantiated claims as this

23 complaint does.  I also don't know that I've seen

24 correspondence between lawyers in a case that's as

25 inflammatory as this.

1          I know this case has been to mediation once.  I

2  understand that was a very distasteful experience.  The way

3  this case is being lawyered is not at a standard that it

4  should be.

5          I'm going to take this motion for sanctions under

6  advisement.  But I can tell you now I don't think,

7  Mr. Dunn, you probably prepared this witness like you

8  should have, and you've all but told me that today.

9          And, Mr. Eichelbaum, I think you smell blood in

10  the water, and you're trying to hit a home run on something

11  that is not a home run ball.

12          I think you're both out of bounds.  And there's

13  no need for cases to be handled like this.  And if you're

14  not already, I want to put you on notice that the Court

15  doesn't approve of that approach to practicing law, and the

16  Court does not want to see that continue in this case.  And

17  to the extent I do see it continue or get worse in this

18  case, I am not at all hesitant to step in and do what I

19  need to do to stop it.  Hard fought litigation is one

20  thing.  The kind of conduct that's transpired here is

21  another.

22          As I say, the motion for sanctions is under

23  advisement.  I'll get you a ruling as quickly as I can.

24  And I want you to understand, I am as serious as I can be

25  about the manner and the tone and the approach and the

1   professionalism and the civility that expect in this case.

2          And if you have any doubts about it, you need to

3   educate yourselves by talking to lawyers that have

4   practiced in front of me regularly as to what I expect,

5   because I'm going to expect that of you, and right now, I'm

6   not seeing it.

7          As a matter of fact, I'm seeing conduct that's

8   very disturbing.  We've got letters that are not extortion,

9   but they're way over the top in the way they're written,

10  Mr. Eichelbaum.

11         We've got lawyers talking about penal code

12  provisions from the podium in a sanctions' motion.

13         This is not ordinary litigation style.  This is

14  not acceptable conduct.  I don't know how it got to this

15  level, but there needs to be a reset on both sides.

16  Regardless of this motion, regardless of how this case goes

17  forward, there needs to be a reset.

18         This matter is under advisement.  You're excused.

19  The Court stands in recess.

20         COURT SECURITY OFFICER:  All rise.

21         (Hearing concluded.)

22

23

24

25

1                          <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes _____              5/6/19___
     SHELLY HOLMES, CSR, TCRR                  Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25